**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

**MARVA WALKER**           )
                                  )
      **Plaintiff,**        )
                                  )
        **v.**            )          **Civil Action No. WGC-09-272**
                                  )
**NATIONAL RAILROAD PASSENGER**  )
**CORPORATION, d/b/a "AMTRAK"**   )
                                  )
      **Defendant.**     )
_____)

**<u>MEMORANDUM OPINION</u>**

Plaintiff Marva Walker ("Ms. Walker" or "Plaintiff") brought this action against Defendant National Railroad Passenger Corporation, d/b/a Amtrak ("Amtrak" or "Defendant") alleging negligence for creating and not repairing a dangerous condition and for not warning invitees of the dangerous condition.  The parties consented to proceed before a United States Magistrate Judge for all further proceedings in the case and the entry of a final judgment.  *See* Document Nos. 13, 15.  Pending before the Court and ready for resolution is Defendant's Motion for Summary Judgment (Document No. 25).  Plaintiff filed a Response (Document No. 26) and Defendant a Reply (Document No. 28).  No hearing is deemed necessary and the Court now rules pursuant to Local Rule 105.6 (D. Md. 2009).

## BACKGROUND[1]

On August 24, 2005 Ms. Walker arrived at the New Carrollton station in New Carrollton,

Maryland to take a train north to attend a Benny Hinn Partners Conference.  Ms. Walker had

visited the New Carrollton station a couple of times before August 24, 2005.

> Q:   Had you ever been to the New Carrollton station prior to August 24, 2005?
>
> A:  Yes.
>
> Q:   When was the first time you were at the New Carrollton station would you say?
>
> A:  I can't tell you exactly.  I could tell you I've been there at least maybe two or three times because I used that station to go to some trade shows in Pennsylvania and in New York before, for my business.

Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), Ex. A (Walker Dep. 33:11 – 19).

The weather on August 24, 2005 was "nice" according to Ms. Walker.  She arrived at the

New Carrollton station in the afternoon.  Ms. Walker acquired her ticket for the train downstairs

and then proceeded upstairs to the platform via an escalator.

> Q:   You took an escalator upstairs, you turned to your right and you walked – – let's see if I got this right – – maybe, what, three or four steps before falling?
>
> A:  No, not three or four.
>
> Q:  How many steps?
>
> A:  Maybe about ten or so.

---

[1] In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Tinsely v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).

Q:   Did you ever look down at the ground between the time you turned the corner and the time you stepped into what you're calling a pothole?

A:   Did I look down?

Q:   Yes, ma'am.  Did you look at the ground?

A:   Yes, I did.

Q:   Did you ever see the pothole before stepping into it?

A:   No, I did not.

Q:   Did you look?

A:   I just answered that question, I said yes.

*                              *                              *

Q:   And you're saying you looked down at the ground, but you never saw [the pothole]?

A:   That's correct.

Q:   And were your eyes focused on the ground all during the ten steps you took?

A:   I said approximately ten steps.

Q:   All during – –

A:   Now, as I said, the view, when I turned, made that right, I told you there were two ladies standing to the right.  So, when I looked forward, I did not see [the pothole].  It's after I passed them, because the platform is narrow, it's after I passed them and was going and was going like gearing back to my right, away from the platform, because, as I said, it's a narrow platform, that's when my foot, my right foot, ended up in the pothole.  So, that's what – – that's what occurred.  So, I did not see this ahead of time.  Of course, I would not have stepped in a pothole.

Q:   You could have avoided it had you looked and seen it, right?  You would have walked around it?

A:   No, that's not what you said.

*                          *                          *

A:   You said did I look where I was going when I turned.  I told you I looked, I saw the platform, which was a clear platform, what I saw.  There were two ladies standing on the right.  When I went to pass them, because the platform was so narrow, when I went to pass them and to the point to gear back away from the – – where the train – – where the end of the platform was, that's when my foot – – that's when I stepped in that pothole.  Okay?  When I passed them, the ladies, how they were standing apparently obstructed the pothole, so I did not see that.

*                          *                          *

Q:   When you passed the two ladies, were you looking at them or were you looking at the ground?

A:   Sir, when I made that corner, I proceeded to make the corner to go down a little bit more on the platform.  When I turned the corner, I was – – I was – – what was in front of me was clear.  Okay?  What was in front of me was clear.  So, I had no need otherwise – – like I wasn't – – I was not distracted.  I was looking straight to where I was going.

Q:   Straight ahead?  You were looking straight ahead?

A:   I was looking – – you asked me if I was looking at the platform.  Now, I think when we look at something, I think we have peripheral vision, we have different senses of vision.  So, if I'm looking at you, that does not mean I'm not looking, I don't see these pictures right here.  Okay?

So, the whole thing is that when I turned that corner, the platform was clear at that point. The ladies were standing to my right. It was close to the end of the platform because and – –

Q:   Which end?

A:   I'm sorry?

Q:   Which end?  The end towards the tracks or – –

A:   Towards the tracks. That's why I geared to the right, to get away from the – – towards the end of the tracks.

4

*Id.*, Ex. A (Walker Dep. 46:4 – 21, 48:8 – 49:19, 50:20 – 52:2).

In response to further questioning Ms. Walker provided additional details about her surroundings on the day of the incident.

> Q:   We talked about the two ladies on the right.  Other than the two ladies on your right, if you remember, can you describe the platform as being particularly crowded or was it clear ahead of you?
>
> A:   All I can say about the platform is that when I turned the [corner] and I had to look down to see the condition because I had a small luggage, a pull luggage with wheels.  If you have a pull luggage with wheels, whether you're walking or not, those little things, it needs a – – it needs pretty much a smooth surface to come – – to drag on.  It was a smaller size of the like the three luggage that I was pulling.  So, I had to observe where I was going, that's all I can say about that.
>
> Q:   Well, are you saying that – –
>
> A:   Are you asking a specific question now?
>
> Q:   I'm asking the question – – listen to my question.
>
> A:   Okay.  I'm listening.
>
> Q:   I'm only asking, did you notice whether, whether, it was crowded ahead of you with other people ready to board the train or were you – – besides the two ladies, we're not talking two [sic] the ladies, now, standing next to the wall, other than the two ladies.
>
> A:   Well, I didn't say, necessarily, against, on the wall.
>
> Q:   Okay.  Wherever they were standing, to the side.
>
> A:   Yes, next to the wall.
>
> Q:   Was it crowded ahead of you, that's all I'm asking you, with other folks heading in the direction you were heading?
>
> A:   Oh, you mean with others walking ahead of me?
>
> Q:   Yes.

A:   No, there was no one walking ahead of me, not immediately ahead of me or anything like that, no.

Q:   Now we'll refer specifically to exhibit 4, which is what you say looks like to you the, and I'm going to use your term, the pothole that you say you stepped in.

A:   Exactly.

Q:   Did you ever see this particular pothole, if you remember, before stepping on it?

A:   No sir, or else I would not have stepped in it.

Q:   When you say "or else I would not have stepped on it," let me just clarify that.  Do you mean you would have walked around it, you would have tried to avoid it?  When you say "or else I would not have stepped in it," what do you mean?

A:   Exactly what I said.  No one steps, in their right mind, steps in a pothole.

Q:   What happened to you?   And which foot went into the pothole?

A:   My right foot.

Q:   What happened?

A:   It twisted.  My foot twisted inward and the rest of my – – and I twisted because I had – – I had my pocketbook.  I had a smaller case and a pulley luggage. That's really what kept me, kept me from falling down on the ground or over on the tracks because I had that extra – – the luggage, the pull luggage, or else I would have been over on the tracks.

Q:   Okay.

A:   That's why I didn't fall to the ground, because I had some resistance with that weight.

Q:   What kind of shoes were you wearing that day, if you remember?

A:   I know the investigator took a picture of the shoes.  Some little pumps.

*Id.*, Ex. A (Walker Dep. 52:21 – 56:2).

Ms. Walker stepped in the "pothole" about two minutes before the arrival of the train. Ms. Walker ultimately boarded the train, declining an inquiry by the conductor about a need for medical attention.  When Ms. Walker arrived at Penn Station, she was taken off in a wheelchair and subsequently taken to the emergency room at St. Vincent's.  According to Ms. Walker she did not receive treatment at the emergency room but was given instructions regarding how to care for her right foot.

As a result of her slipping on the platform at Amtrak's New Carrollton station, Ms. Walker claims she "sustained serious and permanent injuries, has been caused to lose time and wages from her work, has suffered physical pain, and has incurred medical bills."  Compl. ¶ 9. Ms. Walker seeks $75,000 in damages.

## JURISDICTION AND VENUE

Amtrak was created by the Rail Passenger Services Act of 1970.  Amtrak is not a publicly traded company.  All of Amtrak's issued and outstanding preferred stock is owned by the United States government, through the U.S. Department of Transportation, headquartered in Washington, D.C.  *See* Document No. 7 ¶ 2.

Subject matter jurisdiction therefore is based on a corporation organized under federal law pursuant to 28 U.S.C. § 1349.  This section states, "[t]he district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."  *See Maryland Transit Admin. v. National R.R. Passenger Corp.*, 372 F. Supp. 2d 478, 479 n.2 (D. Md. 2005).

Venue is proper in this judicial district because "a substantial part of the events or

omissions giving rise to the claim occurred" in the District of Maryland.  28 U.S.C. § 1391(b)(2).

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at 256.  However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984)

(quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

A.      *What Substantive Law Governs?*

Before addressing the parties' positions regarding genuine issues as to any material fact, the Court must address some preliminary matters.  The Court must first determine which substantive law governs the dispute in this case.  Jurisdiction is not based on diversity of citizenship but on a federally owned corporation.  Therefore the principles in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) do not dictate the application of Maryland law to substantive law questions.

The issue of what substantive law applies in a case involving Amtrak has been addressed by the District of New Jersey.

> Ordinarily, in exercising federal question jurisdiction, a district court is called upon to interpret and apply federal law. *See Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808, 106 S. Ct. 3229, 3232, 92 L. Ed. 2d 650 (1986) (stating that in "the vast majority" of cases under § 1331, federal law "creates the cause of action").  However, Congress was silent concerning tort liability in the statutes creating and funding Amtrak.  There is "no federal general common law." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L.Ed. 1188 (1938).  Sensibly, therefore, "a federal court applies state law when it decides an issue not addressed by federal law, regardless of source from which the cause of action is deemed to have arisen for the purpose of establishing federal jurisdiction." *A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995).  Accordingly, the tort law of New Jersey, as enunciated by the New Jersey Supreme Court, is applicable to this action.

*Hollus v. Amtrak Northeast Corridor*, 937 F. Supp. 1110, 1115 (D.N.J. 1996), *aff'd*, 118 F.3d 1575 (3d Cir. 1997).

For the reasons articulated by the District of New Jersey, this Court finds the tort law of Maryland, as enunciated by the Court of Appeals of Maryland, is the substantive law applicable to this case.

On August 24, 2005 Ms. Walker arrived at the New Carrollton station to board a train. She waited on the platform, on the upper level, for the train. Amtrak admits "it is the sole owner and operator of the platform." Answer ¶ 2. Amtrak also admits Ms. Walker "was a paying customer preparing to board an Amtrak train." Answer ¶ 4. It is therefore undisputed Ms. Walker was at the New Carrollton station for a purpose related to Amtrak's business. Ms. Walker was thus an invitee on August 24, 2005.

B.      *Common Carrier and Passenger*

On August 24, 2005 Ms. Walker arrived at the New Carrollton station to board a train. She waited on the platform, on the upper level, for the train. Amtrak admits "it is the sole owner and operator of the platform." Answer ¶ 2. Amtrak also admits Ms. Walker "was a paying customer preparing to board an Amtrak train." Answer ¶ 4.

The relationship between Ms. Walker and Amtrak is that of a passenger (Ms. Walker) and a common carrier (Amtrak). A common carrier owes a duty to its passengers. "'A common carrier is not an insurer of the safety of its passengers, but is bound to employ the highest degree of care for their safety consistent with the nature of the undertaking.'" *Leatherwood Motor Coach Tours Corp. v. Nathan*, 84 Md. App. 370, 375, 579 A.2d 797, 799 (1990), *cert. denied*, 321 Md. 639, 584 A.2d 68 (1991) (quoting *Mass Transit Adm. v. Miller*, 271 Md. 256, 259, 315 A.2d 772 (1974)).

This *heightened duty* has been defined as follows

> [A] carrier is only bound to employ the utmost care and diligence which human foresight can use. This is the limit and the measure of the duty which he owes to the passenger. His failure or omission to discharge that duty is an act of negligence and if injury results from that negligence an action will lie.

*Baltimore City Passenger Ry. Co. v. Nugent*, 86 Md. 349, 356, 38 A. 779, 781 (1897) (citations omitted).

This *heightened duty* is described with more particularity in a subsequent case.

> [A common carrier] owed the highest degree of care for the safety of its passengers. It was not an insurer of the safety of passengers but was bound only to employ the utmost care and diligence which human foresight can use. It also owed its passengers a duty to deliver them to their destination as expeditiously as possible, consistent with safety. However, the degree of care which is exacted of these carriers is subject to reasonable limitations. The care is not the utmost and highest, absolutely, but the highest which is consistent with the nature of their business, and there must be due regard to its necessary requirements.

*Smith v. Baltimore Transit Company*, 214 Md. 560, 568, 136 A.2d 386, 391 (1957).

The duty owed by a common carrier does not begin when a passenger boards a bus, train, boat or airplane.

> The relationship of carrier and passenger is not confined to the journey itself. It includes not only the duty to transport the passenger safely from one place to another but also, insofar as it is reasonably within the carrier's ability to do so, to provide safe ingress and egress. Therefore, the duty begins when a passenger who has paid his fare or a prospective passenger intending to do so starts to enter upon the conveyance or upon the carrier's station, platform, waiting room, or other facility maintained by the carrier for the passage and convenience of its passengers, and it ends when the passenger has safely existed the conveyance or the carrier's station, platform, or facility. In sum, the duration of the carrier's duty to the passenger is coextensive with the entire period of time the passenger can be said to be in its care.

*Id.* at 379, 579 A.2d at 801.

Based on the above case law, the heightened duty of care Amtrak owed to Ms. Walker was in effect while Ms. Walker was on the platform at the platform at the New Carrollton station.

C.      *Negligence*

Under Maryland law negligence means doing something a person using reasonable care would not do, or not doing something a person using reasonable care would do. *Maryland Civil Pattern Jury Instruction* 19:1. Ordinary or reasonable care means "that caution, attention or skill a reasonable person would use under similar circumstances." *Id.* To establish a *prima facie* case of negligence, Ms. Walker must prove (1) a duty owed to her by Amtrak, (2) a breach of that duty, (3) causation, and (4) damages. *B.N. v. K.K.*, 312 Md. 135, 141, 538 A.2d 1175, 1178 (1988).

Ms. Walker contends Amtrak breached its duty to her since Amtrak created the dangerous condition, Amtrak did not fix the dangerous condition and Amtrak did not warn her of the dangerous condition. Compl. ¶ 7.

According to Ms. Walker, before August 24, 2005, she visited the New Carrollton station on two or three occasions. Ms. Walker does not recall portions of the platform being in a state of disrepair on the previous two or three occasions. Ms. Walker believes the condition of the platform must have been different on those earlier visits "because I didn't – – I didn't injure myself in any potholes." Def.'s Mem., Ex. A (Walker Dep. 36:19 – 20).

The Court has reviewed the photographs of the area where Ms. Walker slipped. Def.'s Mem., Ex. B. at 3-4. *See also* Document No. 21 (Joint Stipulation Regarding Photographs). The Court cannot agree with Ms. Walker's use of the term "pothole." A more accurate description is "an uneven pavement with loose gravel." The photographs confirm Ms. Walker's

characterization of the platform as narrow.  Photograph No. 1 shows the uneven pavement with loose gravel is located near the center of the platform.  Photographs Nos. 4 and 5 show the length of the uneven pavement with gravel, approximately 14 inches across.

Ms. Walker has not moved for summary judgment; Amtrak has.  Since Amtrak is the movant, the focus of the Court's analysis will not be whether Ms. Walker has established a *prima facie* case of negligence by a preponderance of the evidence.  Instead, the Court now turns its attention to the bases for Amtrak's summary judgment motion.

D.    *Contributory Negligence*

Amtrak does not argue that Ms. Walker fails to prove any negligence by Amtrak. Instead, Amtrak argues, presuming Ms. Walker slipped on the New Carrollton station's platform, Ms. Walker's conduct constitutes contributory negligence which completely bars any recovery under Maryland law.  Contributory negligence is an affirmative defense and the party asserting such a defense bears the burden of proof.  Amtrak must show Ms. Walker's negligence was a cause of Ms. Walker's injury.  In its memorandum in support of its motion for summary judgment Amtrak asserts

> Plaintiff cannot claim that she did not see the uneven pavement prior to her fall when her own pictures clearly show the prevalence of the uneven pavement on the platform.  Plaintiff also had an unobstructed view of the pavement because she walked roughly 10 steps on the platform before her incident, was not rushing to make a train (the train arrived two minutes after she was on the platform), and there was nobody walking ahead of her.  Although Plaintiff claims that she "looked, I saw the platform, which was a clear platform," the pictures clearly show that a reasonable person of ordinary intelligence would have undoubtedly seen the uneven pavement on the platform and walked around it.  Consequently, Plaintiff's statement that she did not see the uneven pavement on the platform "cannot be credited."

Def.'s Mem. at 8 (citations omitted).

In her Response Ms. Walker denies she was contributorily negligent.

> [T]he plaintiff testified that the two ladies standing on the platform obstructed her view of the hazard. This testimony means that the hazard was not in plain sight. The plaintiff testified that she came upon the hazard after walking past the two ladies, in between the ladies and the tracks, and then turning right back towards the wall away from the tracks.
>
> It cannot be said as a matter of law that stepping into the pothole that was hidden from view by the ladies is contributory negligence. A jury could reasonably conclude that, given all the evidence, the plaintiff was looking where she was going, was paying attention, and stepped into the pothole because it was hidden from her view by the two ladies. Since the facts are open to interpretation, the court must not rule as a matter of law that the plaintiff was contributorily negligent.

Pl.'s Resp. at 3-4 (citations omitted).

In its Reply Amtrak cites Ms. Walker's own testimony that she had an unobstructed view of the platform for about ten steps after passing the two ladies. Amtrak contends Ms. Walker had an unobstructed view and therefore the uneven pavement with loose gravel was in plain sight. Accordingly, a reasonable person exercising due care would have seen the uneven pavement and walked around it. Ms. Walker's failure to exercise due care constitutes contributory negligence.

The Court has reviewed Ms. Walker's deposition testimony multiple times. It is not very clear exactly *when the ten step count began*. Amtrak claims the ten step count began *after* Ms. Walker passed the two ladies. The Court disagrees based on the following testimony.

> Q: How far did you get before this incident happened *from turning the corner*?
>
> A: It was very – – it was a very short distance because as you turn the corner, if I – – when I turned the corner, I know there were two ladies standing on the side *and right after I passed them, that's when my foot ended up in [the uneven pavement with loose gravel].* So, a few – – I mean, not very far at all.

Def.'s Mem., Ex. A (Walker Dep. 45:12 – 19) (emphasis added).

Shortly after the above exchange Amtrak's counsel questions Ms. Walker about the number of steps she took.

> Q:   You took an escalator upstairs, you turned to your right and you walked – – let's see if I got this right – – maybe, what, three or four steps before falling?
>
> A:   No, not three or four.
>
> Q:   How many steps?
>
> A:   Maybe about ten or so.

*Id.*, Ex. A (Walker Dep. 46:4 – 10).

In deposing Ms. Walker what Amtrak's counsel failed to do was to clarify whether Ms. Walker, after turning the corner, walked ten steps *before* passing the two ladies, walked ten steps *including* when she passed the two ladies, or walked ten steps *after* she passed the two ladies. Besides the passages quoted above, the following exchange between Amtrak's counsel and Ms. Walker is helpful in resolving when Ms. Walker took those ten steps.

> Q:   And you're saying you looked down at the ground, but you never saw [the uneven pavement with loose gravel]?
>
> A:   That's correct.
>
> Q:   And were your eyes focused on the ground all during the ten steps you took?
>
> A:   I said approximately ten steps.
>
> Q:   All during – –
>
> A:   Now, as I said, the view, *when I turned, made that right, I told you there were two ladies standing to the right*. So, when I looked forward, I did not see [the uneven pavement with loose gravel]. *It's after I passed them*, because the platform is narrow, it's after I passed them and was going and *was going like gearing back to my*

*right*, away from the platform, because, as I said, it's a narrow platform, *that's when my foot, my right foot, ended up in the [uneven pavement with loose gravel]*. So, that's what – – that's what occurred. So, I did not see this ahead of time. Of course, I would not have stepped in [the uneven pavement with loose gravel].

Q:   You could have avoided it had you looked and seen it, right? You would have walked around it?

　　　　*　　　　　　　　*　　　　　　　　*

A:   You said did I look where I was going when I turned. I told you I looked, I saw the platform, which was a clear platform, what I saw. *There were two ladies standing on the right. When I went to pass them*, because the platform was so narrow, when I went to pass them *and to the point to gear back away from the* – – where the train – – where the *end of the platform* was, that's when my foot – – *that's when I stepped in that [uneven pavement with loose gravel]*. Okay? When I passed them, the ladies, how they were standing apparently obstructed the [uneven pavement with loose gravel], so I did not see that.

*Id.*, Ex. A (Walker Dep. 48:8 – 49:5, 9 – 19) (emphasis added).

　　　　Based on the above, the Court finds Ms. Walker did not walk ten steps *after* passing the two ladies. The most reasonable inference from the testimony (and in the light most favorable to Ms. Walker as the nonmoving party) is Ms. Walker walked ten steps *including* when she passed the two ladies. Furthermore, Ms. Walker apparently walked a majority of the ten steps *before* passing the two ladies considering that, after passing them and moving toward the right, Ms. Walker's right foot landed on the uneven pavement with loose gravel.

　　　　Amtrak argues the photographs (taken by an investigator on behalf of Ms. Walker) "clearly show the prevalence of the uneven pavement on the platform." Def.'s Mem. at 8. The Court agrees that the uneven pavement with loose gravel is readily apparent in the photographs. However the photographs do not attempt to capture the conditions similar to the afternoon of August 24, 2005. The photographs, four in all, consist of (1) one long range view of the

platform's uneven pavement with loose gravel, (2) one middle distance view of the platform's uneven pavement with loose gravel and (3) two close-up views of the uneven pavement with loose gravel where Ms. Walker slipped.  None of the photographs recreate the circumstances of two ladies standing to the right to demonstrate if an approaching customer's view of the uneven pavement would be completely obstructed, partially obstructed or unobstructed.

Additionally Photograph Nos. 1 and 10 show other areas of the platform's surface that are uneven.  Photograph No. 1 appears to show two other smaller sections where the platform's surface is uneven with loose gravel.  Photograph No. 10, taken at a much closer range to the area where Ms. Walker slipped, appears to show one smaller section where the platform's surface is uneven with loose gravel.  These photographs also reveal a section where some erosion occurred but appears to have been filled.  Amtrak's counsel did not inquire whether Ms. Walker noticed that the platform's surface was uneven or worn as she walked along before slipping.  "The pedestrian has the right to assume that the sidewalk is in a reasonably safe condition for travel, and to act on that assumption."  *Denbow v. Chesapeake & Potomac Tel. Co.*, 199 Md. 609, 618, 87 A.2d 584, 589 (1952).  The Court finds walking on a platform is analogous to walking on a sidewalk; thus, Ms. Walker had a right to assume the New Carrollton station's platform was in a reasonably safe condition for travel.

Was Ms. Walker on notice that the platform's surface was not uniformly smooth before she slipped?  And where were the two ladies standing in relation to these additional uneven or worn sections of the platform's surface?  Ms. Walker testified that she was pulling at least one piece of luggage with wheels.  "'I had to look down to see the [platform's] condition because I had a small luggage, a pull luggage with wheels.  If you have a pull luggage with wheels, whether you're walking or not, those little things, it needs a – – it needs pretty much a smooth

surface to come – – to drag on . . . So, I had to observe where I was going, that's all I can say about that." *Id.*, Ex. A (Walker Dep. 53:4 – 12). Amtrak's counsel did not ask Ms. Walker whether she had any difficulty pulling the luggage with the wheels before slipping in light of the photographs showing more than one portion of the platform's surface is uneven or worn. Since Ms. Walker was pulling a piece of luggage with wheels, did she notice the platform's surface was not uniformly smooth? At the summary judgment stage these questions remain unanswered.

Finally, Amtrak fails to address, if Ms. Walker's view was obstructed by the two ladies standing to the right, whether the uneven pavement with loose gravel, which Amtrak characterizes as open and obvious, becomes a hidden danger due to the presence of the two ladies. And, if these ladies' presence constitutes an "intervening cause," should not Amtrak have reasonably foreseen that some passengers will not readily see the uneven pavement when other passengers are blocking the view? Genuine issues of a material fact exist. Amtrak fails to demonstrate Ms. Walker's contributory negligence.

E.    *Assumption of Risk*

"In Maryland, it is well settled that in order to establish the defense of assumption of risk, the defendant must show that the plaintiff:  (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *ADM P'ship v. Martin*, 348 Md. 84, 90-91, 702 A.2d 730, 734 (1997). In its memorandum in support of its motion for summary judgment Amtrak argues

> [A]s Plaintiff admitted in her deposition, she took roughly 10 steps after getting off of the escalator and therefore had plenty of opportunity to see any patches of uneven pavement. Walker obviously appreciated the risk because, as she claims, if she had seen any obstruction, "[o]f course, I would not have stepped in a pothole." Finally, Walker voluntarily chose to accept the risk of walking on the uneven pavement on the platform because, as evidenced by the pictures, there was more than ample space for

18

> Walker to walk on the outside area of the platform and avoid the
> uneven pavement.  Nothing in the record suggests that Walker was
> forced to walk on the uneven pavement and as her own pictures
> clearly show, she should have walked around the uneven
> pavement.

Def.'s Mem. at 11.

In her Response Ms. Walker contends the analysis made to refute Amtrak's claim of contributory negligence, *i.e.*, the hazard was not in plain sight because the two ladies obstructed Ms. Walker's view, applies to Amtrak's assumption of risk defense.  Additionally, Ms. Walker interprets Amtrak's assumption of risk defense stemming from two different positions.  First, Amtrak suggests the platform's surface was in such terrible shape that any passenger electing to use the platform assumed a risk of injury.  Pl.'s Resp. at 4.  Second, Amtrak suggests Ms. Walker managed to avoid all other uneven patches of the platform's surface before stepping on the uneven surface with loose gravel where she slipped.  "This lends even more credence to the idea that the pothole was hidden from the plaintiff's view by the two ladies standing on the platform. Simply, there is no evidence that the plaintiff stepped into a pothole or upon uneven pavement on purpose."  *Id.*

In its Reply Amtrak contends Ms. Walker's view of the uneven pavement was unobstructed, that Ms. Walker seeks to rely on a portion of her testimony that creates a genuine issue of material fact while "disregarding her own diametrically opposite testimony that she walked past the ladies and '[w]hen I turned the corner, I was – I was – what was in front of me was clear.'"  Def.'s Reply at 2 (citation omitted).

Amtrak asserts Ms. Walker passed the two ladies *before* she turned the corner.  The following is the relevant portion alluded to by Amtrak.

> Q:  When you passed the two ladies, were you looking at them or
> were you looking at the ground?

> A:   Sir, when I made that corner, I proceeded to make the corner to go down a little bit more on the platform.  When I turned the corner, I was – – I was – – what was in front of me was clear. Okay?  What was in front of me was clear.  So, I had no need otherwise – – like I wasn't – – I was not distracted.  I was looking straight to where I was going.

Def.'s Mem., Ex. A (Walker Dep. 50:20 – 51:6).

This portion of the deposition testimony certainly gives the impression Ms. Walker walked past the two ladies *before* turning the corner.  However on at least two other occasions Ms. Walker specifically states she walked past the two ladies *after* turning the corner.

> Q:   How far did you get before this incident happened *from turning the corner*?
>
> A:   It was very – – it was a short distance because as you turn the corner, if I – – *when I turned the corner, I know there were two ladies standing on the side* and right after I passed them, that's when my foot ended up in a pothole.  So, a few – – I mean, not very far at all.

*Id.*, Ex. A (Walker Dep. 45:12 – 19) (emphasis added).

> A:   Now, as I said, the view, *when I turned, made that right, I told you there were two ladies standing to the right*.  So when I looked forward, I did not see [the uneven pavement with loose gravel]. It's after I passed them, because the platform is narrow, it's after I passed them and was going and was going like gearing back to my right, away from the platform, because, as I said, it's a narrow platform, that's when my foot, my right foot, ended up in the pothole.  So, that's what – – that's what occurred.  So, I did not see [the uneven pavement with loose gravel] ahead of time.  Of course, I would not have stepped in a pothole.

*Id.*, Ex. A (Walker Dep. 48:15 – 49:3) (emphasis added).  It is noteworthy that Ms. Walker testified *twice* that she turned the corner *before* passing the two ladies prior to her counsel asking Amtrak's counsel to hold his question because he (Ms. Walker's counsel) wanted a break with

her.  A terse exchange between counsel followed.  There was a break during the deposition.  *Id.*, Ex. A (Walker Dep. 52:3 – 20).

By noting the discrepancy with Ms. Walker's testimony (did she walk past the two ladies *before* or *after* turning the corner), Amtrak demonstrates there is a genuine issue of a material fact.  Similarly the record is not clear regarding when Ms. Walker took those *ten steps* before slipping (it appears clear from Ms. Walker's testimony however that she did not take the ten steps *after* passing the two ladies, *see supra*).

"'The doctrine of assumption of risk rests upon an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward [her] and to take [her] chances from harm from a particular risk.'" *ADM P'ship*, 348 Md. at 91, 702 A.2d at 734 (quoting *Rogers v. Frush*, 257 Md. 233, 243, 262 A.2d 549, 554 (1970)) (alteration in original).  There is a genuine dispute of a material fact, namely, whether Ms. Walker saw the uneven pavement with loose gravel *before* stepping on the surface.  Amtrak relies on statements by Ms. Walker indicating she saw the platform which was clear.  In reviewing such testimony in context, and drawing all inferences in the light most favorable to Ms. Walker as the nonmoving party, Ms. Walker's use of the word "clear" likely referred to the absence of other passengers and not the platform's surface.  Again, however, there is a genuine issue of a material fact.

If Ms. Walker did not see the uneven pavement with the loose gravel *before* stepping on it (and there is a genuine dispute about this material fact), then Ms. Walker did not have knowledge of the danger, did not appreciate the risk and therefore did not voluntarily confront the risk of danger.  Amtrak fails to prove Ms. Walker assumed the risk.

## **CONCLUSION**

For the foregoing reasons, the Court finds there are genuine issues as to material fact and thus Amtrak is not entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An Order will be entered separately denying Amtrak's motion for summary judgment.


 March 22, 2010                                          /s/                        
       Date                                  WILLIAM CONNELLY
                                   UNITED STATES MAGISTRATE JUDGE